please. We welcome you all to this sitting in Houston. And I'm sorry you can't see the Mardi Gras decorations in New Orleans, but that's the way it happens sometimes. We have three cases on the docket this morning. We do appreciate your taking note of the timer which is visible on the podium, but in addition we have traffic lights, so if the yellow light comes on, you have two minutes to argue, and when the red light comes on, please conclude as quickly as possible unless you're answering the court's questions. We have read the briefs and record excerpts. We may not be entirely familiar with the record, so we do appreciate your citations to the record when those are appropriate. The first case of the morning is United States v. Mesquias, 240869. We'll hear first from Mr. Canales. I think it's appropriate to remove my mask, correct? Yes, please. Anyone can remove your mask when you're talking to the court. Good morning. May it please the court. The Hospice Agency submission of claims for payment in counts 2 through 7 cannot be false or trigger criminal liability because the certifying physician's underlying clinical judgment in those counts does not reflect an objective falsehood of the patient. The patients in counts 2 through 7, their diagnoses are scientifically true. You're just challenging those 2 through 7, the substantive health care fraud. I think your client was convicted of four different conspiracies. You're not challenging those? We are, Your Honor. We are, but we're doing that, we're challenging those through counts 2 through 7. The government's theory in this case, and I'll point to the record in a second, the government's theory in this case was that these specific counts of health care fraud with these patients were the evidence and were the examples of the other conspiracies that they charged. And so our position, Your Honor, is that because the government failed to meet its burden and the record does not support the convictions of 2 through 7, that then those other convictions expressly, especially the anti-kickback, that they fall, that they're not sustainable. Obstruction and justice and Yes, Your Honor. I apologize if I didn't communicate that clearly. But through this, Your Honor, our position is that the government built its foundation, a six-legged foundation, on these six patients. And if one of those, we contend that all six falls, that their entire case falls, Your Honor, that they argued Even if those six, if you're right, that those are invalid, a conspiracy is much broader. Maybe there's another 20 out there that there was a, that's why I guess I don't see how challenging those six necessarily challenges the conspiracy. It could be, Your Honor, but I would refer to within the, within the record, that at closing argument, the government stated that these specific seven claims were, were consistent with the broad directives that they would give to employees and to doctors to falsify those claims. Those are just examples of the directives. That's in the record at 63, 53 through page 54. So then what do you do about all of the evidence that you were direct, that your clients were directing fraud, were directing people to lie? I mean, if you direct them to lie about everybody, once in a while there will be an elderly person who does need hospice. So directing thousands of lies doesn't mean that every one of them will be a lie, but it's still a violation of the law, right? Well, Your Honor, and this is where we get into the issue of this case, is what is a, what is actually a lie in, under the hospice statutory framework? What is eligibility? The government needs to prove that those statements were about making a patient ineligible. There are differences of agreement or differences of opinion in a prognosis where two doctors or an administrator and a nurse could disagree about the prognosis of But that's not what the evidence was about. It wasn't about whether this person had this heart disease or not, or whether the heart disease was going to kill the person in six your colleague's client telling everyone to lie, including the doctor certifying. And like I said, maybe once in a while you would have an elderly person who really did need hospice. If you just took a random group of people in their 80s, you might find someone who needs it. But that doesn't change the outcome, does it? It does, Your Honor, because the, what the case should have been about from the government's standpoint, what we contend, is exactly about whether the diagnosis as to whether those patients were or not suffering from the Alzheimer's, for instance, in count two or in count six Okay, but Alzheimer's doesn't necessarily, I mean, Alzheimer's lasts for years. It doesn't necessarily kill you in six months. Exactly, Your Honor. But you know that. I mean, so in other words, that there are a lot of people in, and I should say really 90s is more elderly, 80s really isn't. So people in their 90s, there's a lot of people who have mental issues and whatnot, but they live for many, many years. So the notion that those people should be in hospice care is just not accurate, is it? It is, Your Honor, and if, and that, because that is what Congress and Medicare provided for. There is no time limitation for all So everyone with Alzheimer's can have hospice? That's news to me. If there is a clinical basis for the Alzheimer's and a physician then finds or has the opinion that that patient may die within six months if left untreated, then yes, that Is your opinion, or is your view that a doctor's opinion is, prevents any, as long as a doctor opined that this was necessary, it prevents a fraud? As long as there is a clinical basis for that doctor's prognosis, as long as there is an objective truth behind that, and there was in this Did you offer the underlying medical files? Yes, Your Honor. Actually, we did not have to, Your Honor. The government introduced those themselves. I would, Castaneda, account six is a perfect example. The government put on the stand Dr. Gabe Gonzalez, the primary care physician for Ms. Castaneda, who confirmed her diagnosis of severe Alzheimer's, who had a severe and rapid decline. Based on that and her son's request, he hand wrote an order to hospice, to the Medida Hospice. And how long was she in hospice? I would be guessing, Your Honor, she had multiple certifications. The certification initials for 90 days and had 60. The charge for her was on her, was on her 17th certification period. But the court is well aware, the length of hospice, Terry Schiavo is a famous case where hospice So that's more than three years? Yes, they were not necessarily, you know, consecutive. But this is an issue that Medicare and Congress has Terry Schiavo was, the question in her case was whether she was capable of living without her ventilator, if I'm not mistaken. Right. That's completely different from these. I raise it, Your Honor, as because people can live different lengths of time while on hospice. Well, of course, these counts were exemplary. What do you do with the multiple other witnesses who talked about what your client was instructing them to do repeatedly? Keep people on the hospice care even if they didn't need it. You know, lie about whether they were certified. Don't go around the primary physician, all that. All that's in the record. How do you get around all that? Those statements are in the record, Your Honor. But when you look at the specific cases of these six that the government hand-picked and cherry-picked, none of those statements bear out. Each and every one of these six patients was referred by their primary care physician who was not part of the indictment. Their underlying diagnoses are supported. But just because they weren't part of the indictment doesn't mean they weren't part of the conspiracy. If they knew that they couldn't get any business from your client unless they certified people for hospice, maybe they were certifying inappropriately. And that's what was being suggested in the trial. Right. But a suggestion of that, Your Honor, is a far cry from proof beyond a reasonable doubt of that. And, Your Honor, there is no evidence, there was no testimony linking my client to these suggested conspiracies. And the doctors run replete. We have hospital records, right, from the Baptist hospital system where you have doctors and cardiologists, for example, who are supporting the illnesses of these patients. These patients were real. Jack High was 76 years old. But illness is different than needing hospice. I'm sorry, Your Honor. I mean, having an illness is, there's a difference, as Judge Haynes was saying earlier, having Alzheimer's, having various diseases is different than needing hospice care. Well, once you have... I'm saying as long as you have, as long as this person has a real disease, the hospice certification can't be challenged. I think, Your Honor, under the system that Medicare has established, the eligibility requirements for prognosis... Even when doctors testify they're lying, even when doctors testify they would lose their money, they wouldn't get paid if they didn't certify, and then I could get kickbacks. And that's an excellent point, Your Honor. In this particular case of the six, four were certified by doctors who didn't testify at trial. And then we have the government's witness of Villar, right, and he did certify two of those that he says, that he rubber stamped. So dealing with the first four, what we have essentially in those particular cases is a disagreement of opinions between one physician and nurses and another on the life expectancy of a patient. And I guess my question is, why couldn't the jury resolve that? Well, Your Honor, because... What is there as a matter of law? It's a legal sufficiency question. If the government just simply puts up a case that says we have two different opinions about life expectancy, that is not evidence of fraud. Opinions cannot be, cannot trigger a fraudulent lie of a criminal. Even after the 17th certification, there's no fact issue? So long as that patient, as we've demonstrated here, the underlying, there is no objective, there's nothing objectively false about the patient. The patient was real, the services were rendered. I'm a little confused. You're saying it was a battle of opinions. I thought from reading your briefs, your argument was that the government didn't offer an expert opinion, and you think there's some requirement that they do. I thought the government's case was, it's not a battle of experts, it's just we have witnesses who say the doctors were lying, who say the doctor's only financial incentive was to approve, who say there was kickback. I think that an expert witness is the proper way to establish an objective falsehood of a patient. You just said two expert opinions clash and can't give rise to liability. Well, it can, Your Honor, if it's focused, for instance, in the typical, in the Sanjay case, right, the battle there was whether or not the patients were actually suffering from severe psychosis, right? And that's where you can have an issue determining, well, were they or weren't they? They were not in that particular case, and so there's the debate was, and I say that they did not do it with proper experts, but the debate was whether or not there was a clinical basis for a prognosis of life expectancy. Two doctors can differ as to their life expectancy. I hope I have a doctor who says, hey, I think you're going to continue to live, but you might have another doctor who could reasonably come in and look at the same facts and say, I don't think that you, your life expectancy, if this goes untreated, is within six months. If we, if those doctors' opinions are clashing and there is no objective falsehood about the patient, these claims that were being submitted, my client did not certify a single patient. We're the owners of a hospice. If there is a, if there is a clinical basis for that certification that occurred here by these various doctors. They just, they're just the owners of a hospice that made $150 million over a period of eight or nine years. They had some obligations to the public. That was, that was the, that was the amount billed, Your Honor, but Your Honor brings up a good point. The amount paid was over, over, over a ten year, over a ten year period of time involving nine separate locations that had, that had hundreds of employees. There is no challenge to the fact here, Your Honor, that the services in this case, that the patients were real and that the services were actually rendered. We employed hundreds of employees, hundreds, dozens of doctors, chaplains. I have, I have no, I have no problem about the theory of hospice care and I have no problem about the general idea that sometimes people live a lot longer than they were expected to live, but what the government seemed to show here was that your client set up and organized a vast array of devices to make sure, to maximize the company's income without regard for, and in fact can express disregard for the actual conditions of the patients.  And I don't see how defeating, even if you were to disprove that these six counts, a conviction was, was well founded, how, how that undermines the rest of the testimony. Because that, all of that other testimony, Your Honor, does not negate or controvert the fact that these patients were sick and dying. What it controverts is the What about the woman who testified that she wasn't sick and dying and your people told her she was sick and she nearly committed suicide? That was just a mistake, huh? Well, Your Honor, actually, as soon as she, she wasn't happy with the services that she was being provided and immediately Well, that's why she was going to commit suicide. No, Your Honor, that, no, she, in fact, the very next day that she, that we discharged her, that she was discharged from the Medi, the hospice, she enrolled in another hospice, right, and was certified by that hospice and maintained on their, on, on her care. So, while she did say that she was distraught and upset, the, the facts belied that, that her contention Well, it would make sense going to another hospice. Well, but, but another hospice Well, no, that assumes you're dying, so maybe she just wanted care and she wanted to know forthrightly that they're lying about me and I get to, you know, someone to do my bath and do my food and all that anyway. Respectfully, Your Honor, that does not explain the fact that another hospice with another doctor That's what I'm saying. Maybe she's just feeding off the program herself, but, but be that as it may, I think you, is there any other point you wish to make? Well, the only other point I'd like to make and reserve for the rest is that these six patients are not representative of the entire population, that they were hand-picked, cherry-picked. The court sees in our brief that, that was confirmed by the government's de-designated statistician and that the court, the amount of loss that was calculated in this case is implausible, that you could not extrapolate from these six cherry-picked cases out to the entire whole. The government made a decision there not to pursue that type of evidence, which is the normal, typical way in which it's done. They did not. And so there is an analytical gap between these six and the remainder. Yes, sir. Thank you. We'll give your side time for rebuttal and we'll hear from Mr. Kelsey. May I please the court? The lower court committed error by finding pervasive fraud as to Henry McInnis for certifying patients as terminally ill. The trial record before the judge showed that the patients did receive hospice services. Patients were terminally ill and passed away. And regarding Henry McInnis, the six patients that the government selected, none of them were tied to Henry McInnis specifically. All of them, as we discussed, did receive voluminous hospice services, 14,000 pages in the record showing the services that they received by this large team of care providers and they died with the exception of the patient that was discussed. How is it possible, one may ask, for the entire billing history and there are none of the... Well, what about my point that if you can direct all these doctors to lie and on some of them it's going to turn out to be right. I mean, anybody in this room could die tomorrow and so you just don't know. So the fact that some people died is sad, but it doesn't prove that y'all aren't lying and it's not a conspiracy. So the testimony that your honors have referred to, so what is the worst that was said about Mr. McInnis that he, the government says, directed staff to certify patients no matter what? Well, the court should look to what that testimony referred to. Was it to specific patients connected to Henry McInnis? And when they say employees, okay, now we're not talking about certifications by doctors anymore. We're talking about the admissions process, which is just a big part of the administration of a hospice service. So in the very worst case, I guess the testimony is that there was, you know, supposedly Henry McInnis through someone else vicariously saw two different doctor's opinions and he said, okay, this guy is certifying, this guy is not, you're an outlier, you're fired. I don't see what necessarily is fraudulent. The regulations don't say there needs to be some kind of Chinese wall where you can't even talk about the doctor's way, and basically this type of evidence is problematic. If you are presenting the fact to everybody that unless you certify everybody for hospice, we're not going to use you, that sure sounds like you're telling people to lie. Yeah, again, sometimes it'll be true. I mean, there's no question that random people showing up, somebody is going to be dying. I'm just saying that that seems to be a violation of the law. Are you saying it's not? I do not think on this record the testimony supports that characterization, and I think the best way to analyze it is as Chief Judge Lin did in the Wall case. In that case, there was voluminous evidence of a culture of admitting ineligible patients which included this type of direction. A policy like across the board, quote, mandatory language for admissions from the same type of wirebound guides that every health care provider uses. A policy of refusing to discharge patients without multiple reviews, double checking, everybody go back, you know, you have to go back. We want to, you know, admit everybody, so go back and review them. Physicians certifying patients without reviewing patient files, and in some cases falsified patient records. If that was not enough in a civil case, how could that be in a criminal case? I think Judge Lin correctly analyzed the difference between this type of regulatory certification under the hospice regulations. What is different about this? Well, the regulations themselves, you know, say... In that case, was there evidence of kickbacks and firing people if they didn't certify and testimony that doctors were told what to do? Yes, the evidence I just In Judge Lin's case, you're saying? In the Wall case. It's a civil case, right? And again, there's no testimony in this case that like a specific patient, you know, which was ineligible was directed to overrule. It's all very broad, conclusory, hearsay, lay testimony, and Judge Lin correctly noted that this type of testimony... It's in the record. I mean, it was admitted evidence. The jury could infer whatever it wanted from that that was reasonable from that evidence. Well, I don't think it is reasonable in this context. I think Judge Lin correctly suggested that in this type of so-called conspiracy, when you have a voluminous record, even their selected patients, 14,000 pages, it's undisputed that these patients were all very sick, elderly, and they had terminal illnesses and they died of the terminal illnesses, and there's no doubt that this large team of care providers were providing hospice services that they requested and they depended on them. But every one of them, it was several years before they died, and one of them wasn't even dead at the time of the trial. And that, as I think Judge Lin correctly noted, this is... If the government doesn't like that subjectivity and the fact that hospice has this leeway with the multiple certification periods, they should change the rule. You know, that's not a basis for... Well, I get that not everybody's going to die, whatever your predictions are, and not everybody's going to live, whatever your predictions are. I totally understand that. But how do you address the testimony of y'all, your client, requesting lies and that's the point. Well, I think when you're handling that testimony in the context of this new kind of flavor of regulatory certification fraud that's untethered from actual, the type of fraud, you know, no services or there's no lie at the bottom of this giant conspiracy. When you're addressing this type of paperwork fraud where there's a high likelihood that providers are going to be First of all, you know, once you've determined that, okay, services were provided, can you tie that testimony in any way? Is it just very vague, conclusory, what lacks practices, for instance? I know a co-conspirator, at least one co-conspirator, I think maybe two testified, and our case law says, I mean, the jury's instructed you should view that testimony with suspicion because they're getting a deal. But if the jury believes it, co-conspirator testimony alone is sufficient to support a verdict. So how do you deal with the co-conspirator testimony? I think, I don't think the court should change its general conspiracy precedent. I think Well, our precedent is a cooperating co-conspirator's testimony is, you know, if they said they were dealing drugs, I was part of it, we dealt drugs all the time, the jury on that basis alone, unlike Texas State Court, actually, but in federal court on that alone, the jury's verdict can be upheld. Well, I agree in general. But what I'm saying is, what we're suggesting is, if the conspiracy, if the bottom of it is this type of complicated paperwork certification, which in our brief, page 17 to 22, it describes how you should look at the regulations. Just, if we're going to create a new type of, and Your Honors, this is a novel first impression situation, as other courts have noted, hospice is a little bit different. And so it is important when expanding into this new realm of certification fraud to look at the regulations. What is the novel and unclear regulation specifically? Mr. McInnis is the number two guy in a giant enterprise collecting millions of dollars. And who in his organization, if not Mr. McInnis, is going to know what regulation is unclear? So tell us exactly what regulation was unclear. Right. And for his benefit, he was an office administrator making $70,000 a year. But to answer your question, I can read the statute myself, the regulations myself, and I can see that this is a completely speculative prognosis. And then if you pour through the guidance from Medicare, from CMS, they explain that, you know, this is, there's actually no validated way to audit it. Like, for someone like Henry McInnis, how is he supposed to know? So who has to? I've had other hospice cases. I mean, you know, eventually the government finds out whether the patients were really sick or not. There are a number of examples of patients who appear to have been doing remarkable things considering the fact they were allegedly within 90 days of death. Well, for that one patient, you know, supposedly dancing, you know, he was found on the highway, he had severe Alzheimer's, and he passed away. He had a terminal illness. But I mean, this is an area where the court, according to CMS, should tread lightly in criminalizing a regulation that has 25 civil enforcement mechanisms in place. Because they understand, you know, we've taken this pathway, we've chosen to have it be subjective. And so, sure, if a doctor, if a certifying person says, I admit, I'm lying. So you're saying, you're not saying it's the regulation, because you didn't really answer my question. You're not saying it's the regulation that's unclear. You're saying that by its nature, hospice care is not subject to regulation because nobody knows who deserves hospice. So it is heavily regulated. What is unclear is the actual certification fraud that has been alleged here is that some doctor has subjectively, inaccurately estimated how long someone is going to live, their life expectancy, right? And so if you look, okay, is there any tool for that? And does Medicare endorse any tool and offer hospice providers like this one? So Henry went to a Medicare consultant. They consulted their health care attorneys and said, you know, set us up. How do we rely on this? And everybody across the board, as the AMA and U.S. Chamber of Briefs point out, they all have this understanding that in hospice, you can rely on that doctor's opinion, that subjective opinion. And that's something we're not going to criminalize. We're going to tread lightly, because, you know, that is in their hands. And yes, if they lie, you know, and they plead guilty as Dr. Villar did, subjectively lying about his own prognosis, sure. I mean, that would be, I would consider direct fraud. But when you're expanding the liability outside, under this regime, to people who are, like, looking at this paperwork regime and saying, okay, you know, we have two different opinions. We have, it's not just two different opinions. Mr. McInnes is, you know, faced with a primary care physician's records, you know, 14,000 pages. I would encourage the court just to look at one of those six records. Just peruse them and see, okay, is this anything like fraud? These people are clearly terminally ill. Like, what is someone standing in the defendant's shoes, what are they going to do with this record? And if they have one doctor in one case, they say, you know, it's, you know, saying, I'm not going to certify this other. Okay. And he says, I'm going to fire them. Well, how does Judge Lynn, you know, handle, grapple with that issue? And I think she was correct. I think what she is doing is important for the integrity and the provision of care, as these amicus briefs on this issue. That's all, that's at the civil level. And this is very concerning to hospice providers, to the entire health care system, that the idea that you can expand this paperwork certification, it's really a kind of confusion. So your client was just a victim of a whole bunch of medical errors? I wouldn't necessarily call him a victim. I'm not saying that I, that there shouldn't, that Medicare shouldn't have denied any particular claim. There's a whole kind of set of ways to address what may have been lax practices. I don't know. For me, the record is overwhelming. Like, these people are very ill and they died of their illness. And so I don't think it's... Okay, so excuse me. Sorry. Just one, yeah, you've, I'm going to ask you the same question I asked him in a second, but your point is still, like Mr. Canales, you're just relying on these six counts to exemplify the entirety of the government's case. Is that right? Well... So you're still saying that... Yeah. I think, just to skip to what might be most important for my client, the finding of pervasive fraud, that does require, if he's going to extrapolate from the six patients to the 10,000, that should be based on a proper representative sample. And this, and particularly because the testimony here, the government's own statistician stated that they weren't going to be representative. And the government put forth that same statistician in a case now before Judge Hinojosa, who is the, I understand, formerly the chair of the U.S. Sentencing Commission. And he, for the exact same reason, he said, well, the government said the records are unreliable. Our own records in trial are unreliable, and so it must be pervasive fraud. And Judge Hinojosa, on a very similar set of complaints, said, well, you know what? These records, it's undisputed. These, I guess it was home health care, services were provided, and other doctors, unindicted doctors, at least diagnosed some of these patients. And so, based on the sentencing framework, he said, no, the government needs to go back to this giant 12,000 patient census and identify which ones they believe are fraudulent. And I think that is the most plain error in this case is, you know, and for the industry, it's like, how do you go from this type of evidence to the entire health care, just pulling the plug and saying, okay, you know, your continuity of care doesn't matter. We're closing down the entire hospice system, and those patients were scrambling to find new providers. They were real patients, right? Is that the appropriate way to, you know, criminalize the entire patient census of a hospice network when you're dealing with real patients, with real providers, and a plan of care which should be continued? Okay, well, thank you very much. Thank you, Your Honor. Yes. Okay, Mr. Randall, Handel. Handel, thank you, Judge Jones. Good morning, Your Honors, and may it please the Court, Josh Handel for the United States. Rodney Mesquias and Henry McInnis caused the submission of fraudulent Medicare claims that they knew did not reflect the genuine clinical judgment of the medical professionals who signed off on them. The defendants knew that because they had repeatedly and consistently instructed their employees and associates to manufacture fake diagnoses, falsify patient records, sideline primary care physicians, and do everything possible to keep patients enrolled in hospice and home health services. If we affirm, is this going to end the use of hospice and homebound and leave all these elderly, ill people out in the dirt? Absolutely not, Judge Haynes. Okay, explain to me then the difference between two doctors disagreeing over this person's likelihood of dying in the next six months or this person's need to remain in the home versus this case. Sure. So with respect for my friends on the other side, this is not a case about good faith differences of opinion. It's not a case where the jury was asked to decide whether certain prognoses fell within some cone of objective reasonableness. This is a case in which the government's theory of liability stipulated and its proof at trial demonstrated that the Morita Group's employees were not offering their genuinely held opinions at all. And that is the key under the statute and under the Medicare regulations, is whether a certifier is offering his best clinical judgment in the regulatory language, his clinical judgment. But what about their argument that these people really were sick? They had Alzheimer's or they had this heart disease or whatever. What about that argument? Well, a couple of things on that, so as I believe you might have pointed out or someone else on the panel pointed out, being sick is not the standard for hospice eligibility. The standard for hospice eligibility is a certification that in a physician's best clinical judgment, the patient will expire or is expected to expire within six months, assuming that the disease runs its normal course. Now, certainly the government is not up here arguing, and we did not argue to the jury in the district court, that this sets up some sort of strict liability regime where liability attaches the second that a patient lives past six months or something like that. That was not the theory of the case here. The theory of the case here was that these doctors, these medical directors who were employed by the Morita Group, employed by the defendants, were obeying the defendant's for hospice care without exercising their clinical judgment as to their prognosis. So if they were told every elderly person who comes in looking a little sick, just, you know, certify them for hospice or whatever, if they actually got it right on a few of them, because as I said, I mean, depending on what elderly is defined at, at some point, you, you know, have a short lifespan, likely. That doesn't change your analysis? That's, that's correct, Your Honor. I think that... So explain that. Sure. Well, I think that a fraudulent representation is still fraudulent, even if serendipitously it ends up coming to fruition, right? And I think that that's on all fours with what this court... What about coincidentally instead of serendipitously? I was just thinking it's not serendipitous to die in six months. I apologize. Coincidentally is more appropriate here. Well, let me ask, what was the point of your counts two through seven in the context of the trial? Sure. So I think Judge Jones, the reason that we indicted on these substantive counts and wanted to bring forward evidence for the jury was just to concretize the, the global policy that the defendants were imposing at the Morita Group. We were showing these counts as exemplary. Certainly we, we did not claim that they were exemplary in the sense that there's some statistically random sample, but they exemplified different forms of the fraud that Mr. Mesquias and Mr. McInnis were, were perpetrating at, at the Morita Group. And just to take one example of that, I believe Mr. Canellas discussed the patient underlying count five. That was a cardio Castaneda. Here we have Mr. Castaneda ended up staying on hospice care for two and a half years. Obviously, again, that alone is perhaps not conclusive evidence that the, that the hospice certifications were fraudulent because sometimes even physicians exercising their best clinical judgment get things wrong. But when you pair that extremely unusual length of time on hospice care with Dr. Villar's admission under oath in front of the jury that he falsified Mr. Castaneda's hospice order dated June 3rd, 2014, which is the exact start of the fraudulent period for count that they reflected actual substantive healthcare fraud. And just to give you a record... I didn't see it. Was there a Pinkerton charge? There was a Pinkerton charge, Your Honor. You don't really invoke that in your briefing. So I believe we did very briefly talk about co-conspirator liability, but yes, Your Honor, the jury was instructed on co-conspirator liability. That's at record pages 6508 and 6509. And I think, again, going back to Judge Costa, your line of questioning to one of my friends on the other side, here we have admissions from at least three co-conspirators, Mr. Cardillo, Mr. Villar, and Mr. Garza, that they committed healthcare fraud, that they conspired with Rodney Mesquius and Henry McInnes to commit healthcare fraud. Obviously... Does the case law say that the jury is allowed to believe one, let alone, I mean, just even one of those, and that supports the verdict? Yes. But yet we have, I don't know, pages and pages of briefing. What's your view on whether the other side preserved a sufficiency challenge to the conspiracy? Well, Your Honor, as we discussed, I believe right at the end of our statement of the issues, we read their briefs as only challenging the sufficiency of counts two through seven. Certainly, there was no discussion whatsoever of the kickback conspiracy counts, the obstruction of justice conspiracy counts, to the extent that they're kind of trying to reverse engineer some sufficiency deficiency with the substantive counts to the conspiracy count. I don't think that's the way it works. Certainly, there's plenty of trial testimony and evidence entirely independent of these substantive counts that Mr. Mesquius and Mr. McInnes were conspiring to commit healthcare fraud. So obviously, we think you should affirm across the board because the evidence was sufficient on every count. But our view is that they have waived any challenge to the conspiracy charged in count one, as well as anything other than the substantive healthcare fraud counts in two through seven. But you didn't expressly argue that. Your Honor, I believe we did. This is... I can find the brief page for you in a second. I'm sorry. I don't have it right at my fingertips at the moment. But I believe we... Well, that's all right. We'll take it. Okay. Yes. This is on page 24 of our brief. It's footnote three, where we say that to the extent any isolated comments about the deficiency of other counts appear in their brief, those should be denied for inadequate briefing because they have not developed any argument there. Okay. I'm happy to answer any further questions on sufficiency if the court has them. Otherwise, I'll turn briefly to sentencing. So it's your contention the government could have made its case without counts two through seven? Certainly to sustain the count one conspiracy, yes, Your Honor. So in terms of sentencing, I'd like to begin with just a couple of points on which I think we're all in agreement. First, both the sentencing guidelines and this court's precedents have approved the adoption of the full amount charged to Medicare as the presumptive measure of intended loss when a defendant's claims are deemed to have been pervasively fraudulent. And second, the defendants here have not attempted, either in the district court or before this court, to identify a corpus of purportedly non-fraudulent claims that should be credited against their appeal boils down to whether the district court clearly erred in finding that the Merida Group's Medicare claims were pervasively fraudulent. That determination was adequately supported by two buckets of evidence. Number one, the consistent testimony from numerous trial witnesses that the overwhelming majority of the company's hospice and home health care claims were fraudulent because the patients for whom those claims were submitted did not qualify for services. And number two, the equally consistent, equally expansive testimony that the Merida Group's records were thoroughly and deliberately falsified to the extent that no retrospective after-the-fact analysis of patient files could possibly render a reliable differentiation between fraudulent and non-fraudulent claims. So those two evidentiary pillars, ubiquity of fraud on the one hand, unreliability of records on the other, bring us right into the heartland of this court's cases adopting the pervasive fraud doctrine. The district court faithfully applied that doctrine here, and there's no reason to set aside the resulting sentences. You know, it's interesting. I did simple division of the amount of money that Medicare paid by the number of patients treated, and it seemed to me that the amount of claim per patient, which of course is sort of meaningless, but was only $1,200 to $1,400. Your Honor, I'm not prepared to speak on that. I didn't do the arithmetic myself. Well, that's dividing $10,000 into $124 million. Sure. You know, I think that certainly some of these patients received significantly more that the patients we brought out for the substantive counts were perhaps some of the more egregious examples. Maybe I'm off by a factor. Maybe it's $12,000 per patient. That would be a little bit closer to the average for the substantive counts. Unless the court has further questions, I'll rest on my brief and respectfully request that you affirm the judgments below. Thank you. Thank you. Mr. Guerra. May it please the court. As has been stated by the government and of course by Mr. Kelsey as well, the claim of pervasive fraud is the unstable foundation upon which the conviction and the sentencing decision is built upon to the honorable court. To find the pervasive fraud, as this court has found in United States v. Mescouri, the government was required to show that it was not reasonably practicable to separate legitimate conduct from fraudulent conduct. As has been discussed throughout with the court, the scope of claims and patients that the court has been to look at, based on the indictment, stems from 2009 to 2018. Over 9,000 patients, over 43,000 claims, Your Honor. The fraudulent evidence that the government is relying on specifically stems from Villar and Carrillo, two former disgraced doctors, former medical directors of Merida. I would point out to the court that the record shows that Dr. Villar worked as a Dr. Carrillo was a medical director for Merida for 2014 through 2015. The evidence that the government uses to show fraud can and in some ways should be separated to show what is legitimate and what is fraudulent. As it stands right now, they're claiming every claim, every red cent billed and received by Merida from 2009 to 2018 is fraudulent. And they're saying, we can't separate it because the fraud is so pervasive. We don't know. Well, there's no evidence before the court, either from Villar, from Carrillo, from any lay witness to show that anything prior from 2009 up through 2012, when Villar showed up, that any of that is fraudulent. There was nothing after the substantive counts. The substantive counts, two through six, go from 2000. In this record, did you try to carve out that 2009 and 2012? Because even on a pervasiveness, it just means you can then come in and take away some of it. Well, Your Honor, that's just one example of how they can start showing what may be legitimate and what may be fraudulent. As my co-counsel has also explained as well, there's no accounting in any of either the substantive counts and the evidence provided to that. But did you ask the district court, okay, judge, even if you find it's pervasive, you should carve out 2009 to 2012 because of what you just said? Well, respectfully, Your Honor, the court at sentencing, over our objection, denied our request to provide any sort of evidence or any sort of testimony to that. We filed a motion asking that the court take, allowing us to present this evidence and according to the government's own briefing, as part of an analysis for pervasive fraud, the burden shifts towards us to go ahead and show that some of these claims are legitimate. We requested that at the trial court level at sentencing. The court denied our request. Well, the hearing, right? But I'm saying, did you file a brief saying, you know, people do that all the time. Here's why this is what the law should be. This shouldn't be counted. This should. Your Honor, we did provide argument saying this is what the scope would be. And under cross examination from Mr. Patron, who was initially designated as an expert witness to show statistical analysis, that was also rejected as well. He did admit that there were some areas that there could be some manipulation of time. I would point out that while my time is up, I would note that Mr. Patron did note on the record that he could provide a statistical analysis to show pervasive fraud. And as this court ruled just last year in the United States v. Hyde case, a statistical analysis could be used, an extrapolation could be used to determine pervasive fraud moving forward. The government knew that. That wasn't done by Mr. Patron. He was hired for that. He has been hired to do that in other cases for the government. That simply wasn't done in this case. And I would note, piggybacking off of what Mr. Kelsey said, that is actually what is being asked of Mr. Patron as a government witness in the ongoing case, United States v. Gonzaga Zamora in the McAllen Division by Judge Hinojosa right now. That case went to trial a month after this case did in 2019. Dr. Quesada still has not been sentenced for that very reason, because Judge Hinojosa is conducting the analysis that was not done at the district court level in this case. My time is up. Thank you. Would you tell Mr. Canales he left his mask on the desk? I will happily take it to him, Your Honor. Okay. Thank you. Mr. Kelsey. Your Honor, I think it is incorrect and unfair of the government to say that we waived a conspiracy. Our brief is entirely directed towards a fraudulent conspiracy. We only cite the six patients as kind of even if, you know, this record. So we expressly say that all of the conspiracy count as well as the obstruction count are premised on the same alleged fraud. And so, you know, with respect to obstruction, if the certification paperwork was not fraudulent, it would not support an obstruction charge. And so with respect to the sentencing issue, yes, it, Judge Costa, it was vigorously argued. And the court, the lower court, I mean, he could have done this very basic, long- The sentencing was vigorously argued. I'm asking whether that The pervasive fraud. 2009 to 12 carve out. Was that directly before the district court? And I know there's a huge battle over sentencing. I wasn't the trial counsel, but I'm certain that it was raised because that's kind of a, that's like the first step in just basic analysis, right? You carve out some things. I'm not, I shouldn't be talking about statistics. This is kind of basic. You know, you get your universe and then you take a representative sample. I mean, that is something that was raised and he rejected that and he also didn't allow the good patient evidence. I mean, I don't think that was, I believe if the court, you know, does affirm that that is an issue that, you know, is attracting the most fear and disruption here is the scale and the idea that this headline number of 150 million, that this is the playbook. This is how courts address this type of large patient census. And it would be appropriate for the judge to go back and at least do what the government's own statistician said would be easy and appropriate and that, you know, in order to make any permissible inference about the 10,000 patients. Thank you, Your Honor. All right. Thank you very much. We'll take the case under submission.